2022R00892/GLB

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. |
| | : | |
| v. | : | Criminal No. 22- |
| | : | |
| SAMANTHA ZARETZKY | : | 18 U.S.C. § 1349 |
| | : | (Conspiracy to Commit |
| | : | Health Care Fraud) |

# I N F O R M A T I O N

The defendant having waived in open court prosecution by Indictment, the United States Attorney for the District of New Jersey charges:

**(Conspiracy to Commit Health Care Fraud)**

1.  Unless otherwise indicated, at all times relevant to this Information:

<u>Individuals and Entities</u>

  a. Synergy Medical LLC ("Synergy") was a New Jersey company purportedly involved in, among other things, the marketing and sale of prescription compounded medications.

  b. Defendant SAMANTHA ZARETZKY was a resident of New Jersey who co-owned and operated Synergy. ZARETZKY and Co-conspirator 1 shared the profits from Synergy.

  c. Co-conspirator 1 was a resident of New Jersey who co-owned and operated Synergy.

## Compounding

d.       In general, "compounding" was a practice in which a licensed pharmacist, or a licensed physician, combined, mixed, or altered ingredients of a drug to create a medication tailored to the needs of an individual patient.

e.       Compounded drugs were not approved by the Food and Drug Administration ("FDA"); that is, the FDA did not verify the safety, potency, effectiveness, or manufacturing quality of compounded drugs.

f.       Generally, compounded drugs could be prescribed by a physician when an FDA-approved drug did not meet the health needs of a particular patient. For example, if a patient was allergic to a specific ingredient in an FDA-approved medication, such as a dye or preservative, a compounded drug could be prepared excluding the substance that triggered the allergic reaction.  Compounded drugs could also be prescribed when a patient could not consume a medication by traditional means, such as an elderly patient or child who could not swallow an FDA-approved pill and needed the drug in a liquid form that was not otherwise available.

g.       Pharmacies engaged in the practice of compounding were referred to as "compounding pharmacies."

## Telemedicine

h.       Telemedicine was the remote diagnosis and treatment of patients by means of telecommunications technology, such as the telephone.

Telemedicine allowed health care providers, such as physicians, to write a prescription without the need for an in-person visit.

   i. Telemedicine companies provided telemedicine services to individuals by hiring doctors and other health care providers. Doctors engaged in the practice of telemedicine were referred to as "telemedicine doctors."

Insurance Reimbursements

   j. TRICARE was a health care program of the United States Department of Defense, Military Health System that provided coverage for military beneficiaries worldwide, including active-duty service members, National Guard and Reserve members, retirees, their families, and survivors. TRICARE provided coverage for certain prescription drugs, including certain compounded drugs, which were medically necessary and prescribed by licensed medical professionals.

   k. In New Jersey, the State Health Benefits Program ("SHBP") offered medical and prescription drug coverage to qualified state and local government public employees, retirees, and eligible dependents. The School Employees' Health Benefits Program ("SEHBP") offered medical and prescription drug coverage to qualified local education public employees, retirees, and eligible dependents.

   l. Health care plans sponsored by private employers are governed by the Employment Retirement Income Security Act of 1974 ("ERISA") (collectively, along with TRICARE, SHBP, and SEHBP, the "Health Plans"). The Health Plans offered health insurance benefits to individuals, known as "beneficiaries," pursuant

to contracts between such Health Plans and health care providers. The Health Plans delegated the processing of the claims for reimbursement for their beneficiaries' prescriptions to one of several Pharmacy Benefit Managers ("PBMs") that administered prescription drug benefits and claims on behalf of the Health Plans. Pharmacies submitted electronic claims for reimbursement to the PBMs. If a PBM adjudicated (i.e., approved) the claim, it reimbursed the pharmacy on behalf of the Health Plans, which then reimbursed the PBM.

    m.  The Health Plans and PBMs were "health care benefit programs," as defined in 18 U.S.C. § 24(b), that is, "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract." Under the terms of the health insurance plans and consistent with state and federal law, the Health Plans only validly reimbursed claims for services that: (i) were "medically necessary" and actually rendered, (ii) were provided by a properly licensed service provider, and (iii) complied with the terms of the Health Plans.

## The Conspiracy

2.  From in or about January 2014 through in or about June 2016, in the District of New Jersey and elsewhere, defendant

**SAMANTHA ZARETZKY**

did knowingly and intentionally conspire and agree with others to knowingly and willfully execute a scheme and artifice to defraud health care benefit programs, as defined by 18 U.S.C. § 24(b), and to obtain, by means of false and fraudulent pretenses, representations, and promises, money owned by, and under the custody and control of, health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services, contrary to Title 18, United States Code, Section 1347.

### Goal of the Conspiracy

3.  It was a goal of the conspiracy for ZARETZKY, Co-conspirator 1, and others, to profit by causing the Health Plans to reimburse for expensive but medically unnecessary compounded medications and sharing the reimbursements among themselves.

### Manner and Means of the Conspiracy

4.  The manner and means by which ZARETZKY, Co-conspirator 1, and others sought to accomplish the goal of the conspiracy included, among other things, the following:

   a.  ZARETZKY and Co-conspirator 1, through Synergy's compounded medication business, worked with "billing and distribution" companies to formulate expensive but medically unnecessary compounded medications. The

"billing and distribution" companies formulated particular medications (e.g., scar creams) based solely on the adjudication amount and not medical necessity. Once the "billing and distribution" companies determined the most lucrative compounded medications, ZARETZKY and Co-conspirator 1 worked with co-conspirator pharmacies to create a prescription pad containing only those lucrative compounded medications and nothing else.

    b. ZARETZKY and Co-conspirator 1 also hired "sales representatives" at Synergy to identify beneficiaries of the health insurance plans that covered the exorbitant costs of compounded medications, including the compounds on the prescription pads they had helped create. ZARETZKY and Co-conspirator 1 directed the sales representatives to recruit beneficiaries who agreed to obtain these compounded medications regardless of medical necessity and before a medical professional even determined whether the beneficiaries needed the medications. The beneficiaries recruited by Synergy included friends or family of ZARETZKY, Co-conspirator 1, or their co-conspirators, individuals who were paid by Synergy sales representatives for obtaining the compounded medications, and/or individuals who did not know the substantial cost of the compounded medications.

    c. ZARETZKY and Co-conspirator 1 also retained medical professionals to approve the pre-formulated compounded prescriptions for the beneficiaries without regard to medical necessity. In most instances, those medical professionals had no prior relationship with the beneficiaries and did not perform any meaningful examination of the beneficiaries. For example, on one occasion,

ZARETZKY and Co-conspirator 1 paid a co-conspirator nurse practitioner $500 in cash to approve pre-formulated prescriptions at an event held for beneficiaries at a gym.  Additionally, ZARETZKY and Co-conspirator 1 retained telemedicine companies to approve the pre-formulated prescriptions for beneficiaries.  Specifically, ZARETZKY and Co-conspirator 1 paid the telemedicine companies (on a per-prescription basis) to assign a telemedicine doctor who would conduct a cursory telecommunication consultation with the beneficiaries and approve the pre-formulated prescription pad.  ZARETZKY and Co-conspirator 1 selected telemedicine companies who would direct the beneficiaries' prescriptions to telemedicine doctors who would sign them without questioning the medical necessity and/or cost of the pre-formulated prescriptions.  Notably, one such telemedicine company issued prescriptions through its stable of doctors to approximately 96% of the patients that Synergy had referred to the telemedicine company—all without regard to medical necessity.

        d.      Once those pre-formulated prescriptions were approved, ZARETZKY and Co-conspirator 1 steered the prescriptions to a compounding pharmacy that ZARETZKY and Co-conspirator 1 had a kickback arrangement with.  Specifically, ZARETZKY and Co-conspirator 1 directed the prescriptions to compounding pharmacies that agreed to pay ZARETZKY and Co-conspirator 1 a percentage of the reimbursement amount that the compounding pharmacy received from the Health Plans for each compounded medication that Synergy had sent.

e. From in or about January 2014 through in or about June 2016, ZARETZKY and Co-conspirator 1 caused a loss of at least $35 million to the Health Plans.

In violation of Title 18, United States Code, Section 1349.

## FORFEITURE ALLEGATION

1. Upon conviction of conspiracy to commit health care fraud, contrary to 18 U.S.C. § 1347, in violation of 18 U.S.C. § 1349, defendant ZARETZKY shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), all property, real and personal, obtained by the defendant that constitutes or is derived, directly and indirectly, from gross proceeds traceable to the commission of such offenses, the value of which totaled $2,104,068.10, and which includes, including, but not limited to, all right, title, and interest of the defendant in the following:

   (a) the contents of account number ending in -3801 in the name of Synergy Medical LLC, for the benefit of ▓▓▓▓▓▓▓▓ at Pershing LLC seized on or about January 11, 2017;

   (b) the contents of account number ending in -9355 in the name of Synergy Medical at Pershing LLC seized on or about January 11, 2017;

   (c) the contents of account number ending in -9140 in the name of Synergy Medical at Pershing LLC seized on or about January 11, 2017;

   (d) the contents of account number ending in -6466 in the name of Samantha Zaretzky at AssetMark Trust Company seized on or about January 11, 2017;

and all property traceable to such property.

Substitute Assets Provision

2.  If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    (a) cannot be located upon the exercise of due diligence;

    (b) has been transferred or sold to, or deposited with, a third person;

    (c) has been placed beyond the jurisdiction of the Court;

    (d) has been substantially diminished in value; or

    (e) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property described above.

_/s/ Philip R. Sellinger_
PHILIP R. SELLINGER
United States Attorney